**James David HOUSTON, Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

No. 3339.

Supreme Court of Alaska.

Nov. 16, 1979.

Dana Fabe, Asst. Public Defender, Brian Shortell, Public Defender, Anchorage, for appellant.

Peter A. Michalski, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE, and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Justice.

After trial by jury, James David Houston was found guilty of the second degree mur-

der of Donald Burwell. Houston now brings this appeal from his conviction.

On the afternoon of June 3, 1976, Houston, a 26-year-old sergeant in the United States Army, who was stationed at Fort Richardson, commenced drinking with four of his acquaintances. Later, the five men drove to a liquor store, purchased a bottle of rum, and consumed it in their car. The group then proceeded to the Montana Club, where each had two or three more drinks and shot pool for about an hour. After two of Houston's friends left to go home, the remaining three men, Houston, Elton Futrell, and Al Virgil went to Moby Dick's bar in Anchorage, where they stayed an hour and a half to two hours. At this time, Houston began to feel uncomfortable as he thought that everyone was watching him. Houston went to the men's room, and after returning, informed Virgil that he had loaded his pistol.[1] The three men then returned to the Montana Club, where Futrell and Houston entered the men's room. After two or three individuals left the men's room, Houston and Futrell were alone when Donald Burwell entered. Houston testified that Burwell made some derogatory racial remarks to him and then made a movement toward his pocket. Houston said that he feared the victim (Burwell) was reaching for a gun, so Houston shot him twice. Houston testified the incident lasted about ten seconds. Futrell testified that two to four seconds elapsed between the time that Burwell entered the men's room of the Montana Club and when he heard the first shot. Futrell further testified that he did not hear the victim or Houston say anything. Futrell did not see Burwell with a weapon, and only after the first shot did he observe Burwell in a "slumped position" with his "hand . . . on his side as if he was going . . . into his pocket. . . ." Houston and Futrell then ran out the back door of the Montana Club to Goldie's Bar, where they shot a game of pool and had another drink. As the two

---

1. Houston had purchased a .38 caliber revolver earlier that afternoon. He showed it to his friends prior to leaving for the Montana Club, and explained that he had bought it for target practice and for protection. At that time the gun was unloaded.

left Goldie's about twenty-five minutes later, they were arrested by the police, searched, and taken to the police station. Burwell died in the hospital of gunshot wounds.

Subsequently, a grand jury indicted Houston for the second degree murder of Donald Burwell. Thereafter Houston filed a notice of his intention to rely on an insanity defense. At the same time, Houston filed a motion for a bifurcated trial.[2] The motion was denied after an *in camera* inspection of the then available psychiatric reports. The reports available to the court at that time were those of Dr. Aron S. Wolf, a psychiatrist at Langdon Psychiatric Clinic in Anchorage, and Dr. Allen H. Parker, a psychologist, also at the clinic. Both experts had examined Houston prior to trial at the request of defense counsel. Dr. Wolf diagnosed Houston's condition at the time of killing and concluded that Houston "did lack the substantial capacity at the time to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law."[3] Dr. Parker's conclusion was that Houston did not suffer from organic brain damage.

At trial, neither Dr. Wolf nor Dr. Parker were called by the defense to testify, but the defense did call Dr. Emanuel Tanay, a psychiatrist. Dr. Parker was called by the state as a rebuttal witness after the defense had presented its case. Dr. Parker testified that Houston was neurotic, not psychotic, and that at the time of the act he was not suffering from permanent brain damage. Prior to Dr. Parker's testimony, Houston objected to its introduction, contending that since Dr. Parker was initially retained by the defense to evaluate the likelihood of an insanity defense, Dr. Parker's findings came within the attorney-client privilege. Houston's objection was overruled by the superior court and Dr. Parker was allowed to testify. During Dr. Parker's testimony, the state made known to the jury that Dr. Parker had initially been retained by the defense.

Dr. Tanay, who has worked extensively with Vietnam war veterans, testified that Houston suffered a traumatic neurosis of war which was complicated by severe and chronic alcoholism. Dr. Tanay noted that Houston's history of seizure-like blackout spells was consistent with organic brain damage and indicated that at the time the shooting took place, Houston "suffered from a dissociated episode which was the result of all the [above-mentioned] conditions."

Dr. Tanay's opinion was

[at] the time when this act occurred Mr. Houston acted in a reflex type manner as the result of mental illness and therefore, he did not have the opportunity or the capacity to reflect upon his action so that there was not even a possibility of his appreciating the wrongfulness of his act, nor did he have the capacity to—to refrain from committing the act. The act was—occurred in a reflexed automatic type of fashion against an unknown victim to him.

After trial had commenced, the state requested that the superior court order Houston to submit to a psychiatric examination by Dr. William J. Rader, who had been selected by the state. Defense counsel raised a number of objections to the examination. The most relevant objection to this appeal was that Houston had the constitutional right to have his counsel present at the psychiatric examination. Defense counsel also requested that, if his presence at the examination were denied, the examination be taped. Both requests were denied by the superior court.

2. The memorandum accompanying the motion asserted that Houston had a constitutional right to a jury trial on the guilt phase (self-defense), and a statutory right to a non-jury trial on the insanity phase pursuant to AS 12.45.-083(d), and that since the two defenses were incompatible, bifurcation must be granted.

3. This test is set forth in AS 12.45.083(a):

A person is not responsible for criminal conduct if at the time of the conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

After presentation of the case for the defense, the state called rebuttal witnesses. Dr. Parker's testimony has been summarized above. Dr. Rader testified as to essentially the same factual background of the incident and historical background of Houston as had Dr. Tanay. Dr. Rader's conclusion, contrary to Dr. Tanay's, was that Houston was responsible for his act.

In addition to Dr. Parker's and Dr. Rader's testimony on rebuttal, the prosecution also called Dr. Abel Hipolito, a major in the United States Air Force and a psychiatrist at Elmendorf Air Force Base. Dr. Hipolito testified that he had had the opportunity to observe Houston while Houston had been admitted to the base hospital for alcohol detoxification. Although Dr. Hipolito did not formally conduct a psychiatric interview, he did talk with Houston three times. Dr. Hipolito concluded that Houston was not psychotic, that his memory was not impaired, and that he was not delusional. Houston was released from the hospital two days before the shooting.

Prior to submission of the case to the jury, Houston requested the following instruction:

However, if you find that the defendant did not have reasonable grounds to believe that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, the defendant is not necessarily guilty of second degree murder. If the defendant actually though unreasonably believed that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, he is guilty of manslaughter. If you have a reasonable doubt about this actual belief, you must give the defendant the benefit of that doubt and find him guilty of manslaughter rather than second degree murder.

The superior court refused to give this requested defense instruction.

■ We first turn to appellant's contention that the superior court erred in denying his motion for a bifurcated trial. *Post v. State*, 580 P.2d 304 (Alaska 1978), is dispositive of Houston's argument that he is statutorily entitled to a bifurcated trial. In *Post*, we held:

AS 12.45.083(d) grants a defendant pleading insanity a unilateral right to waive a jury trial. Post argues that this statute permits him to waive a jury trial on the issue of insanity, while retaining a jury trial on all other issues. We do not agree. The statute refers only to waiver of 'a jury trial,' which we interpret to refer to all issues ordinarily tried to a jury. There is no basis for an inference that the legislature intended to create a statutory right to a bifurcated trial.

*Id.* at 306 (footnote omitted).

However, the foregoing is not completely dispositive of the bifurcation issue because Houston has advanced additional arguments in support of his assertion that the superior court erred in denying bifurcation. *Post* is relevant to these additional arguments. There we said:

[T]he question whether there should be a bifurcated trial was committed to the trial court's discretion and would be reviewable on appeal only for abuse. We find no abuse of discretion here. Post made no showing prior to trial of any potential conflict between his insanity defense and his defense on the facts charged. Such a showing is required. *Contee v. United States*, 133 U.S.App.D.C. 261, 410 F.2d 249 [D.C.Cir.1969]; *Parman v. United States*, 130 U.S.App.D.C. 188, 399 F.2d 559 [D.C.Cir.1968].

*Id.* at 306. In *Contee v. United States*, 33 U.S.App.D.C. 261, 262, 410 F.2d 249, 250 (D.C.Cir.1969), Judge Bazelon stated:

[A] sound exercise of the trial court's discretion will ordinarily result in bifurcation whenever a defendant shows that he has a substantial insanity defense and a substantial defense on the merits to any element of the charge, either of which would be prejudiced by simultaneous presentation with the other.

Thus, in light of *Post*, Houston was required to show that he had both a substantial insanity defense and a substantial defense on the merits to be entitled to a bifurcated trial.

Houston first argues that the superior court incorrectly determined that no substantial insanity defense was presented. As noted earlier, Dr. Wolf concluded that Houston "did lack the substantial capacity at that time to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." Although Dr. Parker's conclusions were opposite, we hold that the superior court erred in its finding that there was no substantial insanity defense. However, this holding does not end the inquiry.

Houston was also required to introduce substantial evidence of the merits of his self-defense theory. Houston's self-defense argument was based on his testimony that he shot Burwell because he saw Burwell make a movement for his pocket and feared "he was goin' in his pocket or he was reachin' for somethin'." This evidence presents a basis for a self-defense theory. Thus, we conclude that Houston met the two-prong test set forth in *Contee*, and that his motion for a bifurcated trial should have been granted.

We further conclude that denial of the bifurcation motion substantially prejudiced Houston in the presentation of his theory of self-defense. At the trial, Dr. Tanay was the principal witness who testified in support of the claim that Houston was not criminally responsible for his acts. Review of his testimony discloses that Dr. Tanay did not believe Houston's claim of self-defense.

DR. TANAY: In the washroom [Houston] tells me that Mr. Burwell, who came in there, made some derogatory comments to him, like you'll have to come in here and—which meant to him you blacks, and then he made some other derogatory comment, racial comment, and reached and then Mr. Houston reached for his gun and shot him. Now, that did not sound very convincing to me, did not sound . . . .

Q. Why not?

A. . . . persuasive to me, and I confronted him with it. You ask why not. It didn't sound real to me (1) because I knew from the material that I had that the time interval was minimal, that Mr. Burwell entered the washroom and practically immediately exited shot. . . . So that I did not believe that this could have transpired, and I confronted Mr. Houston with this and he indicated that things were not very clear to him, and I finally said to him maybe you just don't know why. And he was very thoughtful about it and later on when we, in fact, concluded the interview at the door he said to me, oh, maybe you're right after all, maybe I don't know. The point is that it is most unlikely . . . that any kind of interaction took place between Mr. Burwell and Mr. Houston.[4]

In our view, this portion of Dr. Tanay's testimony illustrates the prejudice to Houston's merit defense which resulted from the superior court's denial of a bifurcated trial.[5] We therefore hold that in the particular factual context of this case it was an abuse of discretion on the superior court's part to deny Houston's motion for bifurcation.[6]

4. Dr. Tanay further stated that appellant's blackouts were so frightening that they caused him to fill in the blanks with such reasonable explanations as self-defense. Dr. Tanay testified:

[T]o have a break in one's continuity of one's awareness of what one does is very terrifying. So that people who have organic episodes of not knowing, of confusion, not knowing what's happening, they will very often fill it in with something that makes good sense. To shoot somebody because he's about to shoot you, that makes good sense and that's I believe, something that Mr.

Houston would like to believe. But I don't think that fits the circumstances.

5. *See United States v. Taylor*, 167 U.S.App.D.C. 62, 510 F.2d 1283 (D.C.Cir.1975). In *Taylor*, the court recognized that the merit defense of self-defense conflicts conceptually with an insanity defense.

6. We do not view, as determinative of the prejudice issue, trial counsel's abandonment of self-defense in his final argument to the jury. Once bifurcation had been denied, the conflict between the merit defense and the insanity defense could mandate such strategy. *See Contee v. United States*, 133 U.S.App.D.C. 261, 410

Houston next asserts that allowance of the testimony of Dr. Parker, who examined Houston prior to the trial at the defense counsel's request but was called as a prosecution rebuttal witness, is reversible error. The basis for this specification lies in the contention that Houston's statements at the examination, and the resulting opinion of Dr. Parker as to Houston's criminal responsibility at the time of the killing, are protected by the attorney-client privilege and the sixth amendment right to effective assistance of counsel.

In *United States v. Alvarez*, 519 F.2d 1036, 1045–47 (3rd Cir. 1975), the Third Circuit dealt with similar arguments under facts substantially the same as in the case at bar. In *Alvarez*, defense counsel consulted with a psychiatrist who conducted a psychiatric examination of the defendant prior to trial in order to prepare an insanity defense. Pursuant to Federal Rule Criminal Procedure 16(c),[7] the results of the examination were turned over to the prosecution. The report revealed that the opinion of the psychiatrist was that at the time of the alleged offense the defendant "did know that he was doing what was wrong and did not lack substantial capacity to conform his conduct to the requirements of the law . . . ." 519 F.2d at 1045. The defense decided not to call this particular expert as a witness. The prosecution then subpoenaed the psychiatrist over defense objection. At trial, the defense presented only one psychiatrist who testified that the defendant was insane at the time of the commission of the alleged offense. The psychiatrist initially retained by the de-

fense, but now testifying as a prosecution witness, stated that in his opinion the defendant was not insane. Both psychiatrists testified to essentially the same damaging admissions made by the defendant during their respective psychiatric examinations. The court in *Alvarez* held that the psychiatric examination conducted in preparation for trial was protected · by the attorney-client privilege. The court stated:

> *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) holds that communications to an accountant, in confidence, for the purpose of obtaining legal advice from a lawyer are protected by the attorney-client privilege. No federal case has been called to our attention applying the same rule to a medical expert retained to assist an attorney in preparation for trial. Some state courts have considered the question. *See, e. g., State v. Kociolek*, 23 N.J. 400, 129 A.2d 417 (1957); *San Francisco v. Superior Court*, 37 Cal.2d 227, 231 P.2d 26 (1951). We see no distinction between the need of defense counsel for expert assistance in accounting matters and the same need in matters of psychiatry. The effective assistance of counsel with respect to the preparation of an insanity defense demands recognition that a defendant be as free to communicate with a psychiatric expert as with the attorney he is assisting. If the expert is later used as a witness on behalf of the defendant, obviously the cloak of privilege ends. But when, as here, the defendant does not call the expert the same privilege applies with respect to communications from the defendant as applies to

F.2d 249 (D.C.Cir.1969); *Holmes v. United States*, 124 U.S.App.D.C. 152, 363 F.2d 281 (D.C.Cir.1966).

7. Formerly Fed.R.Crim.P. 16(c), Fed.R.Crim.P. 16(b)(1)(B) now provides:

> *Reports of Examinations and Tests.* If the defendant requests disclosure under subdivision (a)(1)(C) or (D) of this rule, upon compliance with such request by the government, the defendant, on request of the government,

shall permit the government to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, which the defendant intends to introduce as evidence in chief at the trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to his testimony.

such communications to the attorney himself.

*Id.* at 1045–46 (footnote omitted).[8]

Judge Weinstein points out in his scholarly opinion in *United States ex rel. Edney v. Smith*, 425 F.Supp. 1038, 1046 (E.D.N.Y. 1976):

The attorney-client privilege is the oldest of the privileges for confidential communications. . . . The privilege now rests on the theory that encouraging clients to make the fullest disclosure to their attorneys enables the latter to act more effectively, justly and expeditiously—benefits out-weighing the risks to truth-finding posed by barring full disclosure in court.[9]

■ Houston contends that in order for defense counsel to ascertain whether there existed a valid insanity defense, his counsel required the assistance of expert psychiatric opinions, and that this assistance, specifically the opinion of Dr. Parker, comes within the attorney-client privilege. We think the reasoning of *Alvarez* is persuasive [10] and hold that Dr. Parker's examination of appellant comes within Alaska's attorney-client privilege.[11] We therefore do not reach the sixth amendment issue.

**8.** In *People v. Lines*, 13 Cal.3d 500, 119 Cal. Rptr. 225, 234–5, 531 P.2d 793, 802–03 (1975), the California Supreme Court upheld the extension of the attorney-client privilege to psychiatric experts consulted by the defense in preparation for trial:

We reaffirm our holding in *City & County of San Francisco* to the effect that there is no client-litigant exception to the attorney-client privilege. Therefore where, as here, pursuant to section 1017 of the Evidence Code a psychotherapist is appointed by the court in a criminal proceeding to examine the defendant in order to provide the defendant's attorney with information for the purposes set forth in said section, the results of such examination, including any report thereof, and all information and communications relating thereto, are protected from disclosure by the attorney-client privilege notwithstanding the fact that the defendant has theretofore or thereafter tendered in said proceeding the issue of his mental or emotional condition.

The court, however, affirmed the judgment, finding that, although error, the privileged testimony was not prejudicial in that "[a]fter an examination of the entire cause, it does not appear to us to be reasonably probable that a result more favorable to defendant would have been reached in the absence of the above error. We cannot say that there has been a miscarriage of justice." *Id.* 119 Cal.Rptr. at 236, 531 P.2d at 804 (citations omitted).

The prejudicial effect of the error in Houston's case will be discussed *infra*.

**9.** Alaska recognizes the attorney-client privilege. Alaska R.Crim.P. 26(b)(3) provides:

*Attorney-Client Privilege.* An attorney shall not be examined

(1) as to any communication made by this client to him, nor

(ii) as to the attorney's advice given thereon in the course of the attorney's professional employment, except with the consent of his client.

*See* Alaska R.Evid. § 503(a)(5) and 503(b).

**10.** In addition to the *Lines* case cited in footnote 8 *supra*, see *People v. Hilliker*, 29 Mich. App. 543, 185 N.W.2d 831 (1971), and *State v. Kociolek*, 23 N.J. 400, 129 A.2d 417 (1957).

**11.** In commenting upon the extension of the privilege to physicians, Judge Weinstein observed, in *United States ex rel. Edney v. Smith*, 425 F.Supp. 1038, 1047–48 (E.D.N.Y.1976), that:

Nonetheless, from a pragmatic perspective the extension is desirable. Only a foolhardy lawyer would determine tactical and evidentiary strategy in a case with psychiatric issues without the guidance and interpretation of psychiatrists and others skilled in this field. *Cf. United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) ('analogy of the client speaking a foreign language'). As Chief Judge Haynsworth reminded us:

The assistance of a psychiatrist is crucial in a number of respects to an effective insanity defense. In the first place, the presence or absence of psychiatric testimony is critical to presentation of the defense at trial. 'In practical terms, a successful defense without expert testimony will be made only in cases so extreme, or so compelling in sympathy for the defendant, that the prosecutor is unlikely to bring them at all.'

Moreover, the use of an expert for other, nontestimonial, functions can be equally important. Consultation with counsel attunes the lay attorney to unfamiliar but central medical concepts and enables him, as an initial matter, to assess the soundness and advisability of offering the defense. The aid of a psychiatrist informs and guides the presentation of the defense, and perhaps most importantly, it permits a lawyer inexpert in the science of psychiatry to probe intelligently the foundations of adverse testimony. 'If an accused is to raise an effective insanity defense, it is clear that he will need the psychiatrist as a witness. He will need his aid in

■ Anticipating the possibility that a claim of attorney-client privilege might be sustained, the state contends that once Houston placed his criminal responsibility for the homicide in issue, he waived any attorney-client privilege in the case. It is established that the attorney-client privilege is a qualified privilege, and that its infringement may be justified, in some circumstances, by the accused's action or implied waiver.[12] The court in *Alvarez* dealt with a waiver contention similar to that which has been advanced by the state in the case at bar. In *Alvarez*, the court said:

> But the government also contends for a much broader waiver rule. It urges that the assertion of an insanity defense results in the waiver of any claim of privilege with respect to any psychiatric examination of the defendant. . . .
>
> The issue here is whether a defense counsel in a case involving a potential defense of insanity must run the risk that a psychiatric expert whom he hires to advise him with respect to the defendant's mental condition may be forced to be an involuntary government witness. The effect of such a rule would, we think, have the inevitable effect of depriving defendants of the effective assistance of counsel in such cases. A psychiatrist will of necessity make inquiry about the facts surrounding the alleged crime, just as the attorney will. Disclosures made to the attorney cannot be used to furnish proof in the government's case. Disclosures made to the attorney's expert should be

equally unavailable, at least until he is placed on the witness stand. The attorney must be free to make an informed judgment with respect to the best course for the defense without the inhibition of creating a potential government witness.

> The government contends that in this case no harm resulted from Dr. Sadoff's testimony about damaging factual statements made to him by John Martinez, because the trial was bifurcated. But the broad waiver rule which it urges would be equally applicable to cases in which there was no bifurcation. Moreover, the inhibiting effect of a rule waiving the attorney-client privilege with respect to psychiatric consultations in all cases of an insanity defense operates not only with respect to the facts of the crime but also with respect to the defendant's mental state. The attorney should not be inhibited from consulting one or more experts, with possibly conflicting views, by the fear that in doing so he may be assisting the government in meeting its burden of proof . . . . Thus we reject the contention that the assertion of insanity at the time of the offense waives the attorney-client privilege with respect to psychiatric consultations made in preparation for trial.[13]

In our view, the reasoning of the *Alvarez* court is sound, and we thus conclude that this waiver argument must be rejected.[14]

If the state were allowed to subpoena Dr. Parker, the defense counsel's initial effort

determining the kinds of testimony to be elicited, the specialists to be consulted, and the areas to be explored on cross-examination of opposing psychiatrists.' *United States v. Taylor*, 437 F.2d 371, 377 n.9 (4th Cir. 1971) (citations omitted).

12. *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *United States v. Woodall*, 438 F.2d 1317, 1322–26 (5th Cir. 1970), *cert. denied*, 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712 (1971).

13. *United States v. Alvarez*, 519 F.2d 1036, 1046–47 (3rd Cir. 1975). *See also* the following decisions in which the courts relied upon the attorney-client privilege in not permitting the defendant's psychiatrist to be called in the face of waiver contentions: *People v. Lines*, 13

Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1975); *City and County of San Francisco v. Superior Court*, 37 Cal.2d 227, 231 P.2d 26 (1951); *Lindsay v. Lipson*, 367 Mich. 1, 116 N.W.2d 60 (1962).

14. We find unpersuasive the state's assertions that the policies underlying Alaska's criminal discovery rules are not advanced by the recognition of an attorney-client privilege for the examination and the opinion of psychiatric experts on the responsibility issue. In our view, in the face of the underlying purposes of the attorney-client privilege, allowance of rebuttal psychiatric testimony of the type at issue here does not appear to advance the discovery policies of Alaska R.Crim.P. 16.

to become fully informed as to the possibility or likelihood of a valid insanity defense may be inhibited because of the potential that an adverse opinion will be used by the state. Furthermore, the defendant, who is aware of the possibility that the opinion of the expert who is examining him might be adverse to his defense and may be used against him at trial, will probably be less than candid at the examination, further exacerbating the problem. Although the state argues that if the defense is, in fact, valid, the defendant should have no fear of an adverse finding as to his sanity, in reality, the pressure involved to assure the correct result cannot help but to shape significantly the defendant's psychiatric interview.[15]

■ However, the state advances another waiver argument. It points out that Dr. Tanay, the defense psychiatrist, testified that he relied on Dr. Parker's report in reaching a preliminary opinion on Houston's mental condition. The state argues that since Dr. Tanay relied on Dr. Parker's report, Dr. Tanay could be cross-examined about the report, and that there was a waiver of the attorney-client privilege with respect to Dr. Parker's conclusions. Therefore, the state asserts that there was no error in allowing the state to directly examine Dr. Parker as a rebuttal witness. We find the state's argument persuasive and conclude that under the particular circumstances, there was a waiver of the attorney-client privilege. Therefore, we hold that there was no error in allowing the prosecution to call and examine Dr. Parker.

Houston has also specified as error the superior court's refusal to allow his counsel to be present at a mid-trial psychiatric examination which was conducted for the prosecution pursuant to court order. It is contended that the superior court's ruling constituted a deprivation of Houston's sixth amendment right to the effective assistance of counsel and was reversible error *per se*.[16]

Houston's claim of the right to counsel at the court ordered psychiatric examination derives from *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In that case, the Supreme Court established the right of the accused to counsel "at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." 388 U.S. at 226, 87 S.Ct. at 1932, 18 L.Ed.2d at 1157. Whether Houston is entitled to counsel at a mid-trial psychiatric examination depends on whether the examination is a critical stage of proceeding.

It appears that the majority of the courts which have had occasion to pass upon the issue have rejected the claim that defendant has a right to counsel at a court-ordered psychiatric examination. In *People v. Larsen*, 47 Ill.App.3d 9, 5 Ill.Dec. 390, 361 N.E.2d 713 (1977), the court summarized the cases in which the appellants had raised the issue of the sixth amendment right to counsel at a pretrial psychiatric examination, and held that such an examination was not a critical stage of the proceedings.[17]

---

**15.** The state may have the defendant examined by a court-appointed psychiatrist to determine the insanity issue raised by the defense. *See* Alaska R.Crim.P. 16(c)(3) [emphasis added] which provides:

*Notice of Intent to Raise Insanity Defense.* Following substantial compliance by the state with section (b) of this rule a defendant who intends to offer evidence of a defense of insanity shall inform the state of such intention at the time of plea or at such other time as may be designated by the trial court. *The court may order the defendant to submit to a psychiatric examination by a psychiatrist or psychologist selected by the court,* and the report shall be made available to both parties. Notice of intent to raise a defense of

insanity shall not be commented on by the prosecution at trial.

**16.** Houston does not appeal this issue on the grounds that the court-ordered mid-trial examination itself was improper or that such an examination is a violation of the fifth amendment right against self-incrimination. The state, however, has briefed these issues.

**17.** The Illinois appellate court cited the following cases as authority for the majority position:
*U.S. v. Baird* (2d Cir. 1969), 414 F.2d 700, cert. denied, 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497; *U.S. v. Trapnell* (2d Cir. 1974), 495 F.2d 22; *U.S. v. Albright* (4th Cir. 1968), 388 F.2d 719; *U.S. v. Smith* (5th Cir. 1971),

We choose to adopt the majority view that a pretrial psychiatric examination is not a critical stage. The examination is not conducted under suspect circumstances with a high degree of inherent suggestiveness or unfairness to the accused. Unquestionably, defense counsel's presence might aid a cross-examination of the examining psychiatrist at trial. However, the effect of counsel's presence may destroy the usefulness of the examination. We do not believe *Wade* requires invasion of the privacy of the psychiatrist-patient relationship, even if the psychiatrist is court-appointed upon the State's motion.

*Id.*, 5 Ill.Dec. at 402, 361 N.E.2d at 725.

In *State v. Whitlow*, 45 N.J. 3, 210 A.2d 763 (1965), the court, although discussing an alleged fifth amendment violation, observed:

Having in mind the nature of psychiatric examinations, the usual necessity for an extensive interview between the doctors and defendant, and the safeguards now established against use of possible inculpatory statements of the accused as substantive evidence of guilt, we see no absolute duty on the trial court to permit the defense attorney to be present with his client; the matter rests in the court's discretion. If upon application by the State for leave to examine, defense counsel requests permission to be present at the examination, the court should require some showing by the prosecutor as to the attitude of the psychiatrists about the presence of counsel. Of course, if there is no objection, permission should be granted. (In such case, counsel should realize his attendance is in the capacity of an observer, not an active participant.) If, in their view the presence of such a nonprofessional would hinder or operate to reduce the effectiveness of their examination, or if they assert they cannot examine in his presence, the court may in the exercise of its discretion exclude counsel from the examination. In this event, if defendant requests, consideration may be given to the feasibility of permitting such devices as recording instruments or the like to be utilized at the psychiatric interview. In any case the court should allow a defense psychiatrist to attend the examination, if such a demand is made.[18]

Houston supports his assertion that defense counsel is required to be present at a psychiatric examination conducted by the state by relying upon *Shepard v. Bowe*, 250 Or. 288, 442 P.2d 238 (1968), and *State v. Corbin*, 13 Or.App. 536, 516 P.2d 1314 (1973). In *Corbin*, the Oregon Court of Appeals discussed *Shepard*, stating:

In *Shepard v. Bowe*, 250 Or. 288, 442 P.2d 238 (1968), the court held that a defendant, being examined pursuant to court order after raising the issue of insanity, could not be ordered to answer questions, the answers of which would be incriminating, nor could the court order defendant's attorney not be present at the examination. This decision is relevant here for the conclusion that the psychiatrist examining the defendant for the state is for all purposes an officer of the state and no different than any police officer when questioning a defendant. Therefore, a valid consent to a psychiatric examination may not be obtained without the defendant's knowingly and voluntari-

436 F.2d 787; *U.S. ex rel. Wax v. Pate* (N.D. Ill.1967), 298 F.Supp. 164, affirmed (7th Cir. 1969), 409 F.2d 498, *cert. denied*, 396 U.S. 830, 90 S.Ct. 83, 24 L.Ed.2d 81; *U.S. v. Mattson* (9th Cir. 1972), 469 F.2d 1234, *cert. denied*, 410 U.S. 986, 93 S.Ct. 1513, 36 L.Ed.2d 183; *People v. Martin*, (1971), 386 Mich. 407, 192 N.W.2d 215, *cert. denied*, 408 U.S. 929, 92 S.Ct. 2505, 33 L.Ed.2d 342; *State v. Wilson* (1971), 26 Ohio App.2d 23, 268 N.E.2d 814; *Commonwealth v. Stukes* (1969), 435 Pa. 535, 257 A.2d 828. . . . *U.S. v. Fletcher* (D.D.C.1971), 329 F.Supp. 160. *People v. Larsen*, 47 Ill.App.3d 9, 5 Ill.Dec. 390, 402, 361 N.E.2d 713, 725 (1977).

18. We note our view that for purposes of resolving the presence of counsel issue in the instant case we draw no distinction between psychiatric examination conducted prior to trial and those occurring during trial.

ly waiving those rights enumerated in *Miranda*.[19]

The Court of Appeals of New York, in *Lee v. County Court*, 27 N.Y.2d 432, 318 N.Y.S.2d 705, 267 N.E.2d 452, *cert. denied*, 404 U.S. 823, 92 S.Ct. 46, 30 L.Ed.2d 50 (1971), held that pre-trial psychiatric examinations are a "critical stage" of the proceedings, and that the defendant was entitled to have counsel present in the role of .an observer "to make more effective his basic right of cross-examination." *Id.* 318 N.Y.S.2d at 715, 267 N.E.2d at 459. The *Lee* court stated:

In *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, the Supreme Court held that the Sixth Amendment to the Federal Constitution mandates the presence of counsel at critical stages of the prosecution to preserve the right to a fair trial. A "critical stage" was defined as "any stage of the prosecution, formal or informal, in court or out, where" "the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself" (*Wade, supra,* at pp. 226–227, 87 S.Ct. at p. 1932). Since pre-trial psychiatric examinations are a critical stage in the prosecution of one accused of a crime under the *Wade* rationale, the defendant is entitled to have counsel present to make more effective his basic right of cross-examination. (See Note, Right to

Counsel at the Pretrial Mental Examination, 118 U.Pa.L.Rev. 448; *State v. Whitlow, supra,* 45 N.J. 3, at pp. 26–28, 210 A.2d 763). Inasmuch as defense counsel is given the right to the present, it is only fair to allow the District Attorney the same right.

We see no merit to the argument that defense counsel should be permitted to take an active role at the examination, or that he should be allowed to advise his client not to answer questions put to him by an examining psychiatrist or make objections. As in *Wade* situations, the function of counsel is limited to that of an observer. Both the defense attorney and the prosecutor may take notes and save their comments or objections for the trial and cross-examination of the examining psychiatrist.

*Blue v. State*, 558 P.2d 636, 641 (Alaska 1977), and *Roberts v. State*, 458 P.2d 340, 343 (Alaska 1969), established the accused's right to counsel at pre-indictment line-ups and when a handwriting exemplar is taken while the accused is in pre-trial confinement. *Blue* and *Roberts* are in accord with *Lee*, and confirm that an accused's right to counsel includes "the need for counsel to be present in order to evaluate the circumstances and prepare his argument at trial sufficiently to provide the defendant with his Sixth Amendment rights to confront identifying witnesses."[20] In *Roberts v. State*, 458 P.2d 340 (Alaska 1969), the defendant, after indictment and arraignment, was interviewed by the police and apparent-

---

**19.** *State v. Corbin*, 15 Or.App. 536, 516 P.2d 1314, 1318 (1973). The most significant issue in *Shepard v. Bowe*, 250 Or. 288, 442 P.2d 238 (1968), was whether the trial court erred in issuing the following order:

IT IS THEREFORE ORDERED:

1. That Defendant answer questions concerning his accident or conduct at or immediately near the time of the commission of the alleged crime; 2. Counsel for the Defendant is ordered not to advise the Defendant to refuse to answer questions concerning his accident or conduct at or immediately near the time of the commission of the alleged crime;

3. Counsel is ordered not to interfere by advising Defendant not to answer questions

the answer to which might tend to incriminate him; and,

. . . .

Both the *Shepard* and *Corbin* courts determined that the right to counsel at the psychiatric examination was necessary to protect against the right against self-incrimination. As indicated in note 16, *supra*, Houston does not contend that the presence of his attorney was required for fifth amendment reasons, but rather that the presence of counsel is required to provide effective cross-examination, or, effective assistance of counsel guaranteed by the sixth amendment.

**20.** *Blue v. State*, 558 P.2d 636, 641 (Alaska 1977).

ly was coerced into providing handwriting exemplars. Roberts requested that his attorney be contacted. He was told by the police that he did not have to give the writing exemplars, but if he did not, a court order would be obtained and failure to comply with the order would result in contempt of court proceedings against him. The police conducted the interview without the presence or consent of Robert's defense counsel. *Id.* at 343. We held:

> The prejudice to appellant from the violation of his right to counsel at this critical stage of the proceedings may be summarized as follows:
>
> (1) his attorney might have noticed improprieties of which this court is not aware, because the accused, a layman probably frightened by the investigation, may have failed to perceive some improprieties;
>
> (2) had his attorney been present, his cross-examination of the investigators as to the circumstances in which the exemplars were taken, including possible coercion or factors tending to produce inaccuracy, could have been grounded in personal knowledge;
>
> (3) Roberts' attorney, had he been present, could have bolstered Roberts' legal understanding so that he could make an intelligent decision about whether to yield the exemplars at that stage;
>
> (4) counsel might have forced the prosecutor to seek a court order, thereby testing the questions raised under Criminal Rule 26(b)(3) and Alaska Constitution article I, § 9 before yielding the exemplars.

*Id.* at 343–44.

Houston contends that the first two reasons given by this court in *Roberts* for finding that the giving of the handwriting exemplars without counsel present violates the defendant's sixth amendment rights are germane to the case at bar; specifically, that the defense counsel might have noticed improprieties at the psychiatric examination that Houston would not notice and that effective cross-examination of Dr. Rader would then have been enhanced.

We recognize that the proper resolution of the question of whether counsel should be allowed at psychiatric examinations is highly debatable and not free from doubt. Nonetheless, we must scrutinize any pre-trial or mid-trial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.[21]

■ On balance we have concluded that the superior court erred in its refusal to allow Houston's counsel to be present at the court-ordered psychiatric examination. We believe that the guarantee of effective assistance of counsel afforded by Alaska's constitution required the presence of Houston's attorney throughout the psychiatric interview which was conducted by the government's expert witness. In so holding, we are persuaded by the reasoning of the *Lee, Corbin,* and *Shepard* cases which we find are close to the spirit and actual rulings of this court in *Blue* and *Roberts,* and that the rights implicated[22] are best

---

**21.** *United States v. Wade,* 388 U.S. 218, 227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149, 1157 (1967).

**22.** As mentioned earlier, Houston does not base his claim to the presence of counsel on the privilege against self-incrimination. Therefore, we have concluded that this case does not present an appropriate occasion for discussion of the impact of the privilege against self-incrimination upon the need for counsel during a psychiatric interview or for discussion of the privilege's significance in the bifurcation deci-

sion. *But see* Fed.R.Crim.P. 12.2(c) which provides:

> *Psychiatric examination.* In an appropriate case the court may, upon motion of the attorney for the government, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the accused in the course of any examination provided for by this rule, whether the examination shall be with or without

protected by recognition of need for the presence of counsel at a psychiatric examination which is conducted by a state witness.[23] We thus conclude that the superior court erred in its refusal to allow Houston's counsel to be present during the psychiatric interview which was conducted by Dr. Rader.

■ We deem it appropriate at this point to allude to another facet of the psychiatric interview issues presented in this appeal. We think that all such future psychiatric interviews should be tape recorded in their entirety. This requirement will aid in attaining the goal of accuracy in the trial and, in the discretion of the defendant and his counsel, offers a potentially adequate alternative to the physical presence of defense counsel during the psychiatric interview.

In his final specification of error, Houston contends that the superior court erred in refusing to give the following instruction:

> However, if you find that the defendant did not have reasonable grounds to believe that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, the defendant is not necessarily guilty of second degree murder. If the defendant actually though unreasonably believed that he was in imminent danger of death or serious bodily harm and that

deadly force was necessary to repel such danger, he is guilty of manslaughter. If you have a reasonable doubt about this actual belief, you must give the defendant the benefit of that doubt and find him guilty of manslaughter rather than second degree murder.

Basically, Houston asserts that the instructions that were given to the jury were inadequate in that they did not inform the jury that his claim of self-defense, even if imperfect, i. e., based on unreasonable belief, would reduce the charge to manslaughter. That is, he argues his unreasonable belief that Burwell was reaching for a weapon and that he acted in self-defense negates the element of malice required for a conviction of second degree murder.

■ Our review of the court's instructions persuades us that the essential elements of second degree murder and manslaughter were appropriately delineated for the jury. Thus, on the basis of the existing criminal statutes and our own case law, we find no error in the court's refusal to give this instruction.[24]

Reversed and remanded for a new trial in conformity with this opinion.

MATTHEWS, J., dissents in part.

the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.
  In *United States ex rel. Edney v. Smith*, 425 F.Supp. 1038, 1051 (E.D.N.Y.1976), the court observed:
    Provisions such as Rule 12.2 of the Federal Rules of Criminal Procedure are common in state law. *See* Note, Miranda on the Couch—An Approach to Problems of Self-Incrimination, Right to Counsel, and Miranda Warnings in Pre-Trial Psychiatric Examinations of Criminal Defendants, 11 Colum. J.Law & Soc.Probs. 403, 406 n.18 (1975).

23. The context in which this issue has been raised has made it unnecessary for us to attempt to sketch the contours of the role defense counsel will play at the psychiatric interview. For the present, we deem it sufficient to observe that, for the most part, we believe the defense counsel's role will be passive in nature. It is recognized, though, that depending on such factors as whether the trial is bifurcated,

whether or not a rule similar to Fed.R.Crim.P. 12.2(c) is adopted, and whether intimidation or coercion is present, the role of defense counsel at the psychiatric interview could well be altered.

24. In 1978 Alaska's legislature enacted a new Criminal Code which is to become effective on January 1, 1980. Section 11.41.115(d) of the new code provides:
    In a prosecution under § 100(a)(1) or 110(a)(1) of this chapter, it is an affirmative defense that, at the time of the homicidal act, the defendant honestly but unreasonably believed that the circumstances were such that, had they been as he believed them to be, they would have constituted a justification for the killing under AS 11.81.300—11.81.430.
  Section 11.81.335 specifies the circumstances under which the use of deadly force in self-defense is appropriate.

MATTHEWS, Justice, dissenting in part.

In my view no reasonable juror could conclude that Houston's belief that he was in immediate danger of serious physical injury was a reasonable belief. Therefore in my opinion there was no substantial defense on the merits and no error was committed by not bifurcating the trial. On all other issues I am in agreement with the majority opinion. I would remand for a new trial solely on the issue of insanity.